UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| TANYA BROWN, | ) | Case No.: 5:16CV1573 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD NUGENT |
| | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | REPORT AND RECOMMENDATION |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff Tanya Brown (hereinafter, "Brown" or "claimant") challenges the final decision of Defendant Commissioner of Social Security (hereinafter, "Commissioner"), denying her applications for  Disability Insurance Benefits ("DIB"), a Period of Disability ("POD"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

I.  PROCEDURAL HISTORY

On May 3, 2013, Brown applied for POD and DIB, and she applied for SSI benefits on May 31, 2013. (R. 12, PageID #: 66, 265.) Brown stated that she became unable to work because of her disabling condition on May 3, 2013. (*Id.* at 265, 232, 234, 66.) Brown listed her physical or mental conditions that limit her ability to work as: "Bi-polar/mood disorder with psychotic

features." (R. 11, PageID #: 269.) Brown's applications were denied initially and upon reconsideration. (R. 12, PageID #: 128-149, 150-173.) She requested a hearing before an Administrative Law Judge ("the ALJ"). (*Id.* at 189-190.) The ALJ convened a hearing on April 14, 2015, to hear Brown's case. (*Id.* at 82-127.) Brown appeared at the hearing, was represented by counsel and testified. (*Id.* at 84.) A vocational expert ("VE") attended the hearing and provided testimony. (*Id.* at 84, 119-126.)

On May 4, 2015, the ALJ issued his decision concluding that Brown was not disabled, after applying the standard five-step sequential analysis. (R. 12, PageID #: 66-76; *see generally* 20 C.F.R. §§ 404.1520(a), 416.920(a).) The Appeals Council denied Brown's request for review, thus rendering the ALJ's decision the final decision of the Commissioner. (R. 12, PageID #: 54-57.) Brown filed a Complaint on June 22, 2016, seeking judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). (R. 1.) The parties have completed briefing. (R. 14, 16.)

Brown briefs several issues for review. Her fundamental argument is that the ALJ's conclusion lacked the support of substantial evidence to determine that Plaintiff would retain the residual functional capacity to perform a range of unskilled work. Further, Brown contends that the ALJ erred in several respects, arguing error in evaluating her mental impairments, weighing three examining and treating opinions of record, analyzing GAF scale scores assigned in the record, and relying on evidence of Plaintiff's stability. (R. 14, PageID #: 911-913, 918, 920.)

## II.  PERSONAL BACKGROUND INFORMATION

Brown was born on August 14, 1970, and was 42 years old as of her alleged disability onset date. (R. 12, PageID #: 232, 234, 75.) Accordingly, Brown was considered a "younger

2

person" for Social Security purposes. *See* 20 C.F.R. § 404.1563(c). She completed ninth grade and is able to communicate in English. (R. 12, PageID #: 270, 268, 75.) Brown had past relevant work as an assistant manager and as a hand packager. (*Id.* at 121.)

### III.  RELEVANT MEDICAL EVIDENCE[1]

#### A.  Treatment Records

As noted earlier, Brown applied for DIB and SSI benefits on May 3, 2013. (R. 12, PageID #: 66, 265.) Brown listed her physical or mental conditions that limit her ability to work as:  "Bi-polar/mood disorder with psychotic features." (*Id.* at 269.) Here, Brown refers the court to the following relevant evidence. (R. 14, PageID #: 902-910.) On March 17, 2013, Brown presented at the Emergency Department of Mercy Medical Center, where she reported that she was suicidal. She considered overdosing, but instead went to Mercy. (R.12, PageID #: 833-834, 514.) She was seen by psychotherapy triage, and accepted a voluntary admit to crisis for suicide ideation, by Dr. Lindley. (*Id.* at 833, 835.)

Following hospitalization, Brown began treating at Coleman Professional Services, on April 2, 2013. Brown reported problems with depression, anxiety and panic attacks, but denied any suicidal or homicidal thoughts at that point. (R.12, PageID #: 409.) She previously experienced suicidal thoughts and had irritability with mood swings. (*Id.* at 409, 420.) She had been taking Buspar, which "really did help," but did not have money to continue with it. (*Id.* at 409, 414.) She reported anxiety and panic attacks, which made her feel like her chest was caving

---

[1] The recitation of the evidence is not intended to be exhaustive and has been truncated by the court to include only those portions of the record cited by the parties in their briefs *and* also deemed relevant by the court to the assignments of error raised.

in. Brown also reported hearing voices, for six or seven months, telling her to do things she should not do. (*Id.* at 420.)

Brown also reported a history of arrests and incarceration, a history of molestation and sexual abuse, and a history (ten years previously) of crack abuse. She reported current marijuana use. (R.12, PageID #: 423-424.) Counselor Shelly Urey ("no primary credential") diagnosed Brown with mood disorder, NOS; anxiety disorder, NOS; cocaine dependence (in remission) and cannabis abuse. She assigned her a current GAF score of 49, indicating serious symptoms. Brown was referred for further psychiatric evaluation and treatment. (R.12, PageID #: 424-425.)

Brown began treating with Heather Shahan, CNS (clinical nurse specialist), on April 19, 2013, at Coleman Counseling on referral. (R.12, PageID #: 427.) Brown reported that her anxiety was "horrible," her mind races, she hears voices which tell her to hurt herself, and she is easily angered and irritable. (*Id.* at 427-428; *see also* PageID #: 401 (voices).) Shahan diagnosed Brown with bipolar disorder, NOS, with psychotic features; anxiety disorder, NOS; cocaine dependence (in remission) and cannabis abuse. (*Id.* at 429.) She assigned Brown a current GAF score of 40. Brown was started on Latuda (for voices and psychotic features), and continued on Neurontin (for anxiety and mood stability). (*Id.* at 430.)

Brown filed her applications for DIB and SSI benefits on May 3, 2013. (R. 12, PageID #: 66, 265.) She saw Shahan for a follow-up visit on May 17, 2013. The medicine, Latuda, stopped the voices, and her sleep was better, but she was still having some anxiety and agitation. The Neurontin was not helping all day, so the dosage was increased. Brown reported she was starting anger management. No suicidal ideation was reported. (*Id.* at 433-434.)

Several weeks later, on May 28, at Coleman Counseling with Michelle Payne, counselor in training, Brown reported that her anger was worse and her cat was out to get her. (R.12,

PageID #: 405.) She was anxious and irritable. No suicidal ideation was reported. (*Id.* at 405-406.) Her medication did not help with her anger, but helped with her sleep, and reduced episodes of hearing voices, which she only heard "every once in a while." (*Id.* at 406.)

On June 11, 2013, Brown was brought to the Mercy Emergency Department, after she had jumped out of a moving vehicle (traveling 15 mph). She had an abrasion and reported some pain in her right foot, and back pain. The medical record indicates that Brown drank alcohol, took about 20 propranolol, as a suicide gesture, and she was upset and did not want to live anymore. (R.12, PageID #: 440.) She was referred to Abbas Sadeghian, Ph.D., for a neuropsychological assessment. (*Id.* at 444.)

Dr. Sadeghian assessed Brown as agitated, depressed and anxious, with difficulty with flight of ideas. Her cognitive abilities were intact, and she did not manifest any apparent symptoms of psychosis. Brown was diagnosed with bipolar disorder, mixed personality disorder, an overdose/suicide attempt, and a GAF of 45. (R.12, PageID #: 444.) Because Brown was having active suicidal ideation, Dr. Sadeghian recommended she be transferred to a safe and secure psychiatric environment. (*Id.* at 445.)

Brown returned to Nurse Shahan a week later, on June 19, 2013. She reported still feeling upset about a family conflict on Memorial Day, and had tried to overdose, but was stopped by a friend. She went to a hospital ER, but they did not admit her after she settled down. She received Ativan. Shahan discussed an increase in Latuda to help with her mood swings. No suicidal ideation was reported on that date, and no change in her diagnosis was made. (R.12, PageID #: 584-585.)

Brown saw Payne, counselor in training, on June 25, 2013, reporting bad anxiety attacks, and no decrease in her symptoms. At the same time, Payne indicated there were no significant

changes from the previous visit. No suicidal ideation was reported. (R.12, PageID #: 556.) At a July 11, 2013, visit to Payne, Brown reported that anger issues were improving since avoiding her family. At the same time, Brown was behind in her rent, and facing possible eviction. (*Id.* at 560.)

At a July 25, 2013, appointment with Payne, Brown reported her anger was improving. At one point, she got "a little emotional about everything and almost started thinking about" killing herself but her boyfriend talked her out of it. Otherwise, Brown denied any suicidal ideation at that time, and said her medicine "works a lot." She reported that the voice she hears (Jen) "has not been around at all." (R.12, PageID #: 564.) Also, she no longer felt her cat was out to get her. (*Id.* at 564-565.)

On July 31, 2013, Brown reported to Nurse Shahan that she was nervous during the consultative examination with William Mohler, on the previous day. She was doing well on Neurontin and Latuda, with no side effects. Brown reported voices are better with the current medications. She reported no "AOD" (alcohol or other drug use). No suicidal ideation was reported. (R.12, PageID #: 500-501.) No change in her diagnosis was made. (*Id.* at 503.)

At an August 8, 2013, visit to Payne, Brown reported hearing the voice of Jen had decreased, as had her depression. (R.12, PageID #: 569.) Similarly, on September 4, 2013, Brown indicted to Shahan she was doing better on Latuda, although she requested an increase in Neurontin to help with anxiety and mood. At the same time, she reported her mood was stable and things were going well at home, with no suicidal ideation reported. (*Id.* at 596-597.)

Brown reported continued progress at her October 3, 2013, visit with Payne. (R.12, PageID #: 576-577 ("things are good," increased mood stability, decreased auditory hallucinations)). During an October 31, 2013 appointment, Brown also reported continual

6

progress. (*Id.* at 883 (maintaining emotional stability, not hearing voice)). Soon thereafter, in a November 6, 2013 appointment with Nurse Shahan, Brown stated she had been doing well and was less irritable, although still anxious at times. Brown indicated the Latuda and Neurontin had really helped her mood and agitation. She did not report any suicidal ideation. (R.12, PageID #: 876-877.) Again, Brown reported continued progress at a December 13, 2013, visit with Payne. (*Id.* at 872-873 (increased emotional and mood stability, decreased auditory hallucinations).) Payne discussed the possibility of terminating counseling sessions. (*Id.* at 873.) At a January 15, 2014, visit with Shahan, Brown was stable on her current medications. (*Id.* at 865-866.)

In early 2014, Brown noted concerns that an abusive ex-partner was being released from prison, which caused her to have bad dreams. (R.12, PageID #: 861, 859.) But by March 27, 2014, Brown advised Payne that her mood was pretty good, she no longer heard the voice (Jen), and her bad dreams were not as intense (*Id.* at 853). Likewise, on April 16, 2014, Brown reported to Nurse Shahan she was stable with her medications, and denied any suicidal ideation. (*Id.* at 846-847.)

At a June 20, 2014, visit with counselor Urey, however, Brown reported increased symptoms, and that she had been off her medications for months. (R.12, PageID #: 842.) She reported that her hallucinations were returning, and she was having increased nightmares. Her mood was anxious, but her mental status was assessed as fair and she denied any current suicidal ideation. (*Id.* at 842-843.) Counselor Urey encouraged Brown to resume her medications and to return for a follow-up in two weeks. (*Id.* at 844-845.)

During a visit to Nurse Shahan on September 17, 2014, Brown identified worsening mood swings and irritability, and stated the Latuda was no longer helping her mood. Shahan modified her medication, to Seroquel. (R.12, PageID #: 640-641.) The next month, Brown

7

reported to Counselor Urey that she had just started taking her medications again, but was more irritable on the Seroquel. No acute symptoms were observed or reported, other than bad dreams. (*Id.* at 630-631.) As time went on, she reported to Nurse Shahan she was sleeping better on the new medications. (*Id.* at 618, 790.)

Brown reported to Urey on February 6, 2015, that her mood swings and anxiety were getting worse, and she did not want to leave the house. Her mood was normal, but fatigued. (R.12, PageID #: 786.) She was depressed and had bad dreams. She reported working to maintain compliance taking her medications. (*Id.* at 787.) Brown thought various family-related stresses might be affecting her symptoms. (*Id.* at 788.)

### B.  Medical Opinions Concerning Claimant's Functional Limitations

The following are relevant to the parties' arguments:  Brown had a psychological consultative examination with William Mohler, M.A., on July 30, 2013. (R. 12, PageID #: 512-518.) Brown also had a consultative examination with Kenneth Gruenfeld, Psy.D., on November 7, 2013. (*Id.* at 828-832.) Heather Shahan, CNS, who had treated Brown from April 2013, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on March 4, 2015. (R. 12, PageID #: 798-800.) The resulting opinions will be discussed more fully below.

### IV.  TESTIMONY OF VOCATIONAL EXPERT

A vocational expert ("VE") provided testimony during the hearing. (R. 12, PageID #: 84, 119-126.) The VE determined that Brown had past relevant work as a hand packager, light level and as an assistant manager, which was performed at the heavy level of exertion (although it is typically light level). (*Id.* at 121.)

The ALJ posed a hypothetical question concerning an individual of Brown's age, education, and past work experience, with the person limited to no unprotected heights or moving mechanical parts. For mental limitations, the hypothetical individual would be limited to perform simple, routine, and repetitive tasks; frequent contact with supervisors; and, occasional contact with coworkers and the public. The hypothetical question posed was whether such an individual would be able to perform the claimant's past work as actually performed or generally performed in the national economy? (R. 12, PageID #: 121.)

The VE responded that the hand packager job, DOT number 559.687-074, unskilled with an SVP 2, light level would qualify both as claimant performed it and as generally performed. The assistant manager job would be eliminated, primarily because the hypothetical is limited to simple routine repetitive tasks, which constitutes an unskilled level, whereas her past work as assistant manager was skilled. (*Id.* at 121.)

The ALJ requested other jobs that such an individual would be able to perform, specifically seeking one medium level, and two light level. The VE provided several representative occupations. First, a janitor, DOT number 381.687-018, unskilled, medium level, with SVP of 2. There are approximately 45,000 jobs in the state and 1.5 million nationally. An unskilled light job, with an SVP of 2, would be a mail clerk, DOT number 209.687-026, with approximately 3,000 jobs in the state and 72,000 nationally. Another unskilled light job, with an SVP of 2, is housekeeping, DOT number 323.687-014, with approximately 13,000 jobs in the state and 560,000 nationally. (*Id.* at 122.)

The ALJ then modified the hypothetical to change the contact with supervisors from frequent to occasional, and the VE responded that such a change would not affect the assessment and would not reduce the available jobs. (*Id.* at 123.)

9

Counsel for the claimant asked the VE what an acceptable rate of absenteeism for unskilled work would be. The VE defined absenteeism as missing an entire day, coming in late, or leaving early, and stated employers will generally allow for about 10 to 12 absences per year, although he noted some may have a probationary period (30 or 60 days) where no absences would be tolerated. (*Id.* at 123.)

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in his May 4, 2015, decision:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2. The claimant has not engaged in substantial gainful activity since May 3, 2013, the alleged onset date (20 CFR 404.1571 *et seq.* and 416.971 *et seq.*).

3.  The claimant has the following severe impairments:  bipolar disorder with psychotic feature, anxiety disorders, and cocaine and marijuana abuse (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  The claimant cannot work around unprotected heights or moving mechanical parts. She is limited to performing simple, routine, and repetitive tasks, and can have occasional contact with supervisors, co-workers, and the public.

6.  The claimant is capable of performing  past relevant work as a Hand Packager, DOT No. 559.687-074, an unskilled job generally performed at the light exertional level, and performed by the claimant  at the light exertional level. This work does not require performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.  The claimant was born on August 14, 1970, and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.  The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (*See* SSR 82-41 and 20 CFR  Part 404, Subpart P, Appendix 2).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569,404.1569(a), 416.969, and 416.969(a)).

11.  The claimant has not been under a disability, as defined in the Social Security Act, from May 3, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 12, PageID #: 68-70, 74-76.)

## VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. §§ 404.1505(a), 416.905(a)

Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

> First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(i). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. *Id.* § 404.1520(a)(4)(ii). Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled. *Id.* § 404.1520(a)(4)(iii). Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(iv). Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled. *Id.* § 404.1520(a)(4)(v).
>
> The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004); *see also* 20 C.F.R. § 416.920(a)(4).

## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence. *Blakley v. Comm'r of Social Security*, 581 F.3d 399, 405 (6th Cir. 2009); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003); *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981). Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed. *Wright*, 321 F.3d at 614; *Kirk*, 667 F.2d at 535.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). This court may not try the case *de novo*, resolve conflicts in the evidence, or decide questions of credibility. *Wright*, 321 F.3d at 614; *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). The court, however, may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VIII.  ANALYSIS

Brown raises multiple issues for review. Her primary argument is that the ALJ's conclusion lacked the support of substantial evidence to conclude that Plaintiff would retain the residual functional capacity to perform a range of unskilled work. She, further, argues the ALJ erred in evaluating Plaintiff's mental impairments, the ALJ erred in weighing three examining and treating opinions of record, the ALJ erred in his analysis of the GAF scale scores assigned in the record, and the ALJ erred in relying on evidence of Plaintiff's stability. (R. 14, PageID #: 911-913, 918, 920.) The court will analyze these arguments in a logical order, but after considering the ALJ's decision, the parties' arguments and the pertinent legal authorities, the court finds that the ALJ's decision is supported by substantial evidence.

## A.  Weight of Opinions

Brown contends that the ALJ erred in weighing the opinions of three examining and treating providers. (R. 14, PageID #: 913-918.) Two of these sources were consultative examiners, and the third was a psychiatric clinical nurse specialist who had treated Brown from April 2013, before the alleged onset date, through the date of the hearing. Brown argues that the ALJ's analysis was in error, and lacked the support of substantial evidence. (R. 14, PageID #: 913.)

As an initial matter, the ALJ was required to consider each medical opinion, 20 C.F.R. §404.1527, but none of these providers are treating sources who are entitled to receive controlling weight. The ALJ considered the opinions of the three sources, and as explained below, the court finds no error in the ALJ's decision.

## 1.  CNS Shahan

Heather Shahan, CNS, completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) on March 4, 2015. (R. 12, PageID #: 798-800.) The assessment stated that Brown had marked limitations in carrying out complex instructions, and difficulties interacting with others in the workplace. Also, Shahan said Brown "can't leave the house," and that she would miss more than four workdays per month. (*Id.* at 73-74, citing PageID #: 798-799.) The ALJ gave Shahan's opinion "little weight" because such severe limitations were not supported by Shahan's own records, and Brown's mental health had been stable save for one instance early in her treatment. The ALJ also noted that Shahan, as a CNS, "is not an acceptable medical source." Although he gave her opinion "little weight," the ALJ did consider it with respect to severity and effect on function. (*Id.* at 74.)

14

Brown argues that the ALJ's assignment of "little weight" to Shahan's assessment "undermines the purpose of Social Security Ruling (SSR) 06-3p." (R. 14, PageID #: 917-918.) The court, however, does not agree with Brown's contention. The ALJ correctly stated that a clinical nurse specialist, such as Shahan, is not an "acceptable medical source." 20 C.F.R. §§ 404.1513(a), 416.913(a); *see also* SSR 06-3p, 2006 WL 2329939, at *1. SSR 06-3p discusses the importance of the distinction between "acceptable medical sources" and other health care providers, as follows:

> The distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons. First, we need evidence from "acceptable medical sources" to establish the existence of a medically determinable impairment. Second, only "acceptable medical sources" can give us medical opinions. Third, only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight.

SSR 06-3p, 2006 WL 2329939, at *2 (internal citations omitted).

Nevertheless, while information from other sources such as a clinical nurse specialist cannot establish the existence of an impairment, "the information may provide insight into the severity of the impairment," and how it affects the individual's ability to function. SSR 06-3p, 2006 WL 2329939, at *2; *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007); *Reynolds v. Colvin*, No. 1:12CV2994, 2013 WL 5316578, at *7 (N.D. Ohio Sept. 23, 2013). Opinions from "other sources" who have seen the claimant in a professional capacity should be evaluated by considering how long the source has known the claimant, how consistent the source's opinion is with other evidence, and how well the source's opinion is explained. *Cruse*, 502 F.3d at 541. The regulation further provides that the ALJ should explain the weight given to the other source's opinion. 20 C.F.R. §§ 1527(e)(2), 416.927(e)(2); *Cruse*, 502 F.3d at 541.

The ALJ properly considered the purpose of SSR 06-3p and the fact that Shahan, as a CNS, was not an acceptable medical source. The ALJ considered her records and report regarding the severity and effect on function. (R. 12, PageID #: 74, citing SSR 06-3p.). The ALJ assessed Shahan's opinion and gave it little weight, after recognizing that Shahan provided extensive counseling to Brown, because her opinion was inconsistent with her own treatment records and the balance of medical evidence of record. (R. 12, PageID #: 74.) There is substantial evidence in the record that demonstrates Brown's condition improved over time, with proper medication. (*Id.* at 564 (medication "works a lot"), 500-501, 596-597, 576-577, 883 (emotional stability, not hearing voice), 876-877 (doing well), 865-866, 846-847 (stable with medications).) When Brown ceased compliance with her medications, on the other hand, her symptoms returned. *See, e.g.*, *Id.* at 787, 842 (off medications for months, increased symptoms). The ALJ's explanation was sufficient to satisfy the articulation required by the regulations with respect to non-medical or other medical sources.

The court finds that the ALJ satisfactorily explained the weight given to Shahan's opinion. *See* 20 C.F.R. §§ 1527(e)(2), 416.927(e)(2); *Cruse*, 502 F.3d at 541. The court further concludes that the ALJ's reasons are supported by substantial evidence in the record.

## 2. Mohler

Brown had a psychological consultative examination with William Mohler, M.A., on July 30, 2013. (R. 12, PageID #: 512-518.) Mohler found she met diagnostic criteria for mood disorder, with psychotic features; personality disorder, NOS, with antisocial features; and assigned a GAF of 50, indicating serious symptoms. (*Id.* at 73, citing PageID #: 516.) Mohler opined that Brown's ability to understand, remember and carry out instructions would be somewhat below average, her distractibility would cause difficulty with multi-step tasks, she

16

would be very unlikely to respond appropriately to supervision and to coworkers, and would have considerable difficulty dealing with work-related stress. (*Id.* at 73, citing PageID #: 517.)

The ALJ gave "some weight" to Mohler's opinion, stating "the balance of the medical record does not portray an individual with such severe limitations." (*Id.* at 73.) He also asserted that it appeared that the opinion was based on "little more than claimant's self-report." *Id*. That fact was considered "particularly problematic" by the ALJ, and supports the ALJ's assessment of Brown's credibility, because, despite a significant history of substance abuse, she denied any substance abuse history to Mohler. (*Id.* at 73.) Mohler noted, in the Substance Use History section, that Brown "denies any problems with drugs or alcohol." (*Id.* at 514.) As the ALJ points out, that denial is contravened by other evidence in the record. (*Id.* at 73; *see, e.g.*, *Id.* at 423-424 (history of crack abuse; current marijuana use).)

Although Brown attempts to identify ambiguity concerning her substance abuse history (R. 14, PageID #: 913-914), the ALJ also stated that other considerations weighed against her overall credibility. In particular, although the claimant asserted she had not worked since 2013, there are numerous references in the record to work activity. (R. 12, PageID #: 73, citing, *e.g.*, PageID #: 743 (told ER doctor in March 2014 "recently started a new factory job"); PageID #: 615 ("missed work to take care of child" in November 2014).)

As already discussed above, there is substantial evidence in the record that demonstrates Brown's condition had improved since a crisis period of early 2013, with proper compliance with her prescribed medications. For example, Brown reported to Mohler that she had applied for disability "[b]ecause of the voices and I can't be around people." (*Id.* at 513.) But Brown also told Mohler that the Latuda helped with the voices "considerably." (*Id.* at 514, 516.) Mohler

17

noted that the claimant's prognosis had improved as result of her involvement with mental health treatment. (*Id.* at 516.)

As the ALJ reported, Mohler's opinion was based in part on self-reported information (R. 12, PageID #: 513), and Mohler cautioned that there was "inadequate background information provided to evaluate the reliability of the self-report" (*Id.* at 516). Mohler also stated that no psychological testing was performed as part of his assessment. (*Id.* at 516.) Mohler, nonetheless, found claimant's ability to understand, remember and carry out instructions would be somewhat below average, and problems with distractibility would not prevent her from carrying out simple tasks. (*Id.* at 73, citing PageID #: 517.) But it is apparent from the ALJ's RFC—which limits Brown to perform simple, routine, repetitive tasks—that the ALJ considered Mohler's opinion and gave it some weight. (R. 12, PageID #: 70.)

The court finds that the ALJ satisfactorily explained the weight given to Mohler's opinion and the reasoning for that determination. *See* 20 C.F.R. §§ 1527(e)(2), 416.927(e)(2); *Cruse*, 502 F.3d at 541. The court finds that the ALJ's decision is supported by substantial evidence in the record.

### 3.  Dr. Gruenfeld

The claimant also had a consultative examination with Kenneth Gruenfeld, Psy.D., on November 7, 2013. (R. 12, PageID #: 828-832.) Dr. Gruenfeld found Brown met diagnostic criteria for psychotic disorder, anxiety disorder, major depressive disorder, and assigned a GAF of 45, indicating serious symptoms. (*Id.* at 832.) Dr. Gruenfeld filled out a Mental Functional Capacity Assessment, opining that Brown was markedly limited in a number of vocational areas, including dealing with detailed instructions and getting along with others. (*Id.* at 828.) The ALJ gave "partial weight" to Dr. Gruenfeld's opinion, concluding it was based largely on claimant's

18

self-report and was not consistent with her psychological treatment records. Rather, as the ALJ noted, Brown's treatment records demonstrate she has been stabilized through counseling and psychotropic medication. (*Id.* at 74.)

The ALJ concluded that Dr. Gruenfeld's opinion was entitled to partial weight because it was based primarily on Brown's self-reporting, which was not consistent with the psychological treatment records. There is substantial evidence in the record that demonstrates Brown's condition had improved since early 2013 with medication compliance. *See, e.g.*, R. 12, PageID #: 830 (Latuda helps reduce hallucinations.) In addition, the ALJ's consideration of Dr. Gruenfeld's opinion is reflected in the RFC, which accommodates any difficulty the claimant has following complicated instructions and getting along with others by limiting Brown to simple routine work with only occasional interactions with others. (*Id.* at 70, 74.)

The court finds that the ALJ satisfactorily explained the weight given to Dr. Gruenfeld's opinion. *See* 20 C.F.R. §§ 1527(e)(2), 416.927(e)(2); *Cruse*, 502 F.3d at 541. Further, the ALJ's decision is supported by substantial evidence in the record.

### B.  GAF Scale Scores

Brown also contends that the ALJ erred in analyzing the GAF scale scores assigned in the record. (R. 14, PageID #: 918-920.) She complains that the ALJ did not specifically evaluate the GAF scores assigned by Mohler, Shahan, and Dr. Gruenfeld. (R. 14, PageID #: 918.) Brown asserts that the record evidence shows GAF scale scores over a two-year period ranging from 40, for the most part, to several in the 45-50 range. Consequently, Brown argues that the GAF scale scores indicate the clinicians' judgment about her functioning and demonstrate consistent scores supporting a finding that her mental impairments were disabling. (R. 14, PageID #: 919-920, citing record.)

A GAF score is "a clinician's subjective rating of an individual's overall psychological functioning," that is, a general assessment of an individual's mental functioning. *Kennedy v. Astrue*, No. 06–6582, 2007 WL 2669153, at \*5 (6th Cir. Sept. 7, 2007); *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000). While a GAF score may assist the ALJ in formulating the RFC, it is not raw medical data, and it is not essential to the RFC's accuracy. *Kennedy*, 2007 WL 2669153, at \*5; *Howard v. Commissioner*, 276 F.3d 235, 241 (6th Cir. 2002). No particular amount of weight is required to be placed on a GAF score. *Johnson v. Commissioner*, No. 12-2249, 2013 WL 5613535, at \*10 (6th Cir. Oct.15, 2013). An ALJ's failure to reference a GAF score in the RFC does not make the RFC inaccurate. *Howard*, 276 F.3d at 241. In fact, the Sixth Circuit has pointed out that "the Commissioner 'has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy*, 2007 WL 2669153, at \*5 (internal citations omitted). In addition, an update to the DSM eliminated the GAF scale because of "its conceptual lack of clarity … and questionable psychometrics in practice." *See Diagnostic and Statistical Manual of Mental Disorders*, 16 (American Psychiatric Ass'n, 5th ed., 2013).

The ALJ, however, stated that he had taken into consideration the various GAF scores provided by the treating sources and the consultative examiners in the record, but further noted, "GAF scores are of limited use in assessing the severity of a mental impairment." (R. 12, PageID #: 74.) GAF scale scores, as the ALJ noted, have limited value and simply represent a clinician's judgment about the severity of an individual's symptoms or level of functioning at a particular point in time and do not provide a reliable long-term assessment of mental functioning, prognosis or treatment outcomes. *Id.* The ALJ also pointed out that the GAF scale does not

correspond to the severity requirements of the Agency's mental disorder listings. *Id.* The ALJ did assign some weight to the GAF scores in the record, "insofar as they reflect a longitudinal history roughly congruent with the claimant's current residual functional capacity." *Id.*

The court does not find error in the ALJ's analysis. The ALJ applied the correct legal standards when considering the GAF scores, and his findings are supported by substantial evidence.

### C.  Claimant's Stability

Finally, Brown contends that the ALJ erred in relying on evidence of Brown's "stability." (R. 14, PageID #: 920-921.) Brown argues that the ALJ's reliance on her stability with medication and counseling lacks the support of substantial evidence. She also asserts that "stable" does not necessarily mean "employable." (R. 14, PageID #: 920.) Brown does not cite any case authority to support this argument.

In addition, Brown does not provide a specific citation to the portion of the ALJ's decision that she is contesting in her discussion of this issue. In summing up the evidence in the medical record, the ALJ stated that, although Brown had some limitations due to anxiety, depression, and social issues, "she has been stable with medication and counseling, and appears to be active throughout the day." (R. 12, PageID #: 72-73.) The ALJ determined she is capable of performing work within the limitations of the RFC set forth in the decision. (*Id.* at 73.)

The court has already outlined substantial evidence in the record that demonstrates Brown's condition had improved since early 2013, through compliance with her medication regimen. Reviewing the parties' arguments and the evidence of record on this issue, the court finds Brown's argument unavailing; and further, that the RFC is supported by substantial evidence.

21

RECOMMENDATION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence. Accordingly, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.

s/ David A. Ruiz
David A. Ruiz
United States Magistrate Judge

Date:  May 31, 2017

**OBJECTIONS**

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).